******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, C. J., with whom MULLINS and KAHN, Js., join, dissenting. In *State* v. *Diaz*, 302 Conn. 93, 109–11, 25 A.3d 594 (2011), this court declined to exercise its supervisory authority over the administration of justice to extend its earlier decision in *State* v. *Patterson*, 276 Conn. 452, 470, 886 A.2d 777 (2005), which required a special credibility instruction for jailhouse informants, to all witnesses who are in a position to receive a benefit from the state. In distinguishing jailhouse confessions from testimony about the witness' observations, the court stated that "to require a special credibility instruction for all witnesses who may be in a position to receive a benefit from the state because they are involved in some way with the criminal justice system . . . would [create] an exception that would swallow the rule that the trial court generally is not required to give such an instruction for the state's witnesses." *State* v. *Diaz*, supra, 110. Primarily for this reason, I respectfully disagree with the majority's extension of the meaning of "jailhouse informant" for purposes of the *Patterson* instruction to include incarcerated individuals who cooperate with law enforcement by providing information regarding inculpatory statements made by a defendant who was not incarcerated at the time. Because I would affirm the judgment of the Appellate Court upholding the murder conviction of the defendant, Billy Ray Jones; see *State* v. *Jones*, 187 Conn. App. 752, 754, 770, 203 A.3d 700 (2019); I respectfully dissent.

I agree with the majority's recitation of the facts, procedural history, and background legal principles. "It is a well established principle that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . The charge must be correct in the law, adapted to the issues and sufficient to guide the jury. . . . The primary purpose of the charge to the jury is to assist [it] in applying the law correctly to the facts which [it] find[s] to be established. . . . [A] charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 466–67.

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." (Internal quotation marks omitted.) Id., 467. In

*State* v. *Patterson*, supra, 276 Conn. 470, this court first held that special credibility instructions were required for jailhouse informant witnesses. The court in *Patterson* considered the similar motives of jailhouse informants and other exceptions to the general rule against special credibility instructions[1] and concluded that, "[b]ecause the testimony of an informant who expects to receive a benefit from the state in exchange for his or her cooperation is no less suspect than the testimony of an accomplice who expects leniency from the state," defendants are entitled to a special credibility instruction in cases involving jailhouse informants. Id. Although *Patterson* did not define which witnesses qualify as jailhouse informants, the witness at issue in that case had been incarcerated with the defendant and testified to statements made by the defendant while they were incarcerated together. Id., 459. Later, in *State* v. *Arroyo*, 292 Conn. 558, 564, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), this court expanded the *Patterson* rule to include jailhouse informants who have not yet received a benefit from the state. As in *Patterson*, the witnesses at issue in *Arroyo* were individuals incarcerated with the defendant who testified to confessions made by the defendant in a courthouse lockup. Id., 564–65.

Subsequently, in *State* v. *Diaz*, supra, 302 Conn. 93, this court provided a more precise definition of the term "jailhouse informant." In *Diaz*, three witnesses "who had criminal matters pending" testified against the defendant at trial. Id., 95. Two of the witnesses, Corey McIntosh and James Jefferson, testified about events they observed outside of prison that connected the defendant to the crime. Id., 96–97. A third witness, Eddie Ortiz, testified regarding events observed outside of prison as well as the defendant's confession to him while they were in lockup together. Id., 96. The defendant in *Diaz* first argued that it was plain error for the court not to provide a *Patterson* instruction "in light of [the witnesses'] involvement in the criminal justice system and the possibility that they would receive some benefit from the government in exchange for their testimony." Id., 99. In rejecting the plain error claim, this court observed: "Typically, a jailhouse informant is a prison inmate who has testified about confessions or inculpatory statements made to him by a fellow inmate. Indeed, this court's decision in *Patterson* was based on that premise. . . . *Patterson* has not been applied to require a special credibility instruction when an incarcerated witness has testified concerning events surrounding the crime that he or she witnessed outside of prison, as distinct from confidences that the defendant made to the witness while they were incarcerated together." (Citation omitted.) Id., 102. Accordingly, the court determined that McIntosh and Jefferson were not jailhouse informants under *Patterson* and *Arroyo*, as they "testified only about the events surrounding the

shooting" that they had observed outside of prison. Id., 104. The court then concluded that, although the trial court failed to give a special credibility instruction with regard to the testimony of Ortiz, who qualified as a jailhouse informant, this omission was not plain error requiring a new trial because the court "gave a general credibility instruction and the jury was made aware of Ortiz' motivation for testifying." Id., 105.

The defendant in *Diaz* also requested that we exercise our supervisory authority "to instruct the trial courts that they must give a special credibility instruction whenever a witness in a criminal case is incarcerated or is serving out a sentence, *or otherwise is in a position to receive a benefit from the state in exchange for testifying* . . . ." (Emphasis added.) Id., 106. The court noted the concern, as expressed in *Arroyo*, that a jury may be unaware of the motivations behind a witness' testimony. Id., 109. The court nevertheless disagreed with the defendant's argument "that these concerns are as weighty in cases [*in which*] *the witness is not testifying about a jailhouse confession*, but is testifying about events concerning the crime that the witness observed. Testimony by a jailhouse informant about a *jailhouse confession* is inherently suspect because of the ease with which such testimony can be fabricated, the difficulty in subjecting witnesses who give such testimony to meaningful cross-examination and the great weight that juries tend to give to confession evidence. . . . In contrast, when a witness testifies about events surrounding the crime that the witness observed, the testimony can be compared with the testimony of other witnesses about those events, and the ability of the witness to observe and remember the events can be tested. Accordingly, cross-examination and argument by counsel are far more likely to be adequate tools for exposing the truth in these cases than in cases involving jailhouse confessions." (Citations omitted; emphasis added.) Id., 109–10. After declining to exercise its supervisory authority, the court emphasized that it remains in the discretion of the trial court "to give a cautionary instruction to the jury whenever the court reasonably believes that a witness' testimony may be particularly unreliable because the witness has a special interest in testifying for the state and the witness' motivations may not be adequately exposed through cross-examination or argument by counsel." Id., 113.

The reasons supporting this court's refusal to exercise its supervisory authority in *Diaz* apply with equal force to the present case. The witness at issue, Larry Shannon, was not testifying about a jailhouse confession made while he was incarcerated with the defendant and, therefore, does not qualify as a jailhouse informant. Connecticut courts have routinely limited the definition of a jailhouse informant to only those individuals testifying to statements made by the defendant while the

witness and the defendant were incarcerated together.[2] See *State* v. *Salmond*, 179 Conn. App. 605, 630, 180 A.3d 979 (concluding that *Patterson* held that "a special credibility instruction is required in situations [in which] a prison inmate has been promised a benefit by the state in return for his or her testimony regarding incriminating statements made by a fellow inmate" while both were incarcerated (internal quotation marks omitted)), cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018); *State* v. *Franklin*, 175 Conn. App. 22, 35 n.14, 166 A.3d 24 ("[the witness] met the definition of a jailhouse informant because he was incarcerated at the time of his testimony at the defendant's trial and his testimony was about a crime that he had not witnessed personally, but a confession or inculpatory statements made by the defendant during their incarceration"), cert. denied, 327 Conn. 961, 172 A.3d 801 (2017); *State* v. *Carattini*, 142 Conn. App. 516, 523–24, 73 A.3d 733 (witness testified as to defendant's statements regarding victim's death made outside of prison, so "he did not meet [the] Supreme Court's definition of a jailhouse informant"), cert. denied, 309 Conn. 912, 69 A.3d 308 (2013).

I disagree with the majority's conclusion that the location of the confession does not matter to the jailhouse informant analysis. The United States Supreme Court has noted that the circumstance of incarceration presents an important factor in cases involving inmates working as paid informants who elicit statements for the government: "[The] [c]ourt [in *Miranda* v. *Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] noted the powerful psychological inducements to reach for aid when a person is in confinement. . . . [T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents." (Citation omitted.) *United States* v. *Henry*, 447 U.S. 264, 274, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980). Any pressures that accompany incarceration that could lead a defendant to speak to another inmate about his crimes were not at play in the present case. See *State* v. *Smith*, 289 Conn. 598, 633, 960 A.2d 993 (2008) (confession to jailhouse informant was made "in light of the camaraderie that arises under such shared circumstances").

Indeed, "[i]n-custody confessions are often easy to allege and difficult, if not impossible, to disprove. To generate a credible confession, a snitch need only learn some basic details about a fellow inmate's case. A lying jailhouse snitch might gather information about a high profile case simply by reading newspaper stories or watching television broadcasts about the case. Snitches can also obtain details about fellow prisoners' cases by speaking with complicit friends and relatives who can monitor preliminary hearings and other case proceedings and feed details to the aspiring snitch. In some cases, informants share knowledge about case facts

with each other, permitting multiple informants to corroborate each other's testimony. Investigators have documented cases in which prison inmates purchased information from others outside of prison in an attempt to trade it for reduced sentences." (Footnotes omitted; internal quotation marks omitted.) R. Covey, "Abolishing Jailhouse Snitch Testimony," 49 Wake Forest L. Rev. 1375, 1380–81 (2014); see *State* v. *Leniart*, 333 Conn. 88, 167, 215 A.3d 1104 (2019) (*Palmer, J.*, concurring in part and dissenting in part) (distinguishing "traditional cooperating witnesses," such as coconspirators, from use of jailhouse informant testimony insofar as "the testimony of jailhouse informants is readily fabricated and otherwise particularly suspect for a number of reasons not generally apparent to jurors," particularly because "more traditional cooperating witnesses . . . have not come forward as part of a prison culture that is largely hidden from public view and whose testimony is not so easily concocted"); *State* v. *Diaz*, supra, 302 Conn. 109 (noting that "jailhouse confessions" are challenging to confirm and to successfully cross-examine).

These concerns about jailhouse informants are inapplicable in this case, as Shannon's testimony could be meaningfully validated in ways that a jailhouse confession could not. Shannon testified that (1) he was in Marina Village, a Bridgeport housing complex, the day after the shooting, (2) he saw the defendant there, (3) there was a news clip about the murder on the television, (4) the defendant told Shannon he walked up to the victim, asked "what's poppin' now," and shot the victim, and (5) the defendant showed Shannon a silver, nine millimeter Ruger handgun. Unlike a jailhouse confession, which is difficult to verify, Shannon's testimony could be validated and meaningfully cross-examined by questioning the circumstances surrounding the alleged confession. For example, other witnesses could confirm or disprove elements of the confession, like whether the defendant and Shannon were present at Marina Village the day after the shooting.

For these reasons, I would limit the definition of jailhouse informant testimony to those statements made by the defendant to another inmate while both were incarcerated in order to afford the phrase its customary meaning. Individuals testifying to statements made outside of the incarceration setting are simply informants or cooperating witnesses, as they are not testifying to statements made in a "jailhouse." Shannon is not a jailhouse informant, as jailhouse informants are connected to the defendant only by virtue of their status as an inmate, unlike Shannon, who knew the defendant outside of jail and was present at the scene of the crime to which the defendant confessed to committing. If the definition of jailhouse informant is no longer afforded its customary meaning, the number of witnesses who would qualify as a jailhouse informant are endless, and "we would be creating an exception

that would swallow the rule that the trial court generally is not required to give such an instruction for the state's witnesses. It is an unfortunate reality that the government cannot be expected to depend exclusively upon the virtuous in enforcing the law. . . . Rather, the government must often rely on witnesses with a less than impeccable history in order to prosecute criminal activity." (Citation omitted; internal quotation marks omitted.) *State* v. *Diaz*, supra, 302 Conn. 110–11.

Not only was the defendant in the present case not incarcerated at the time he allegedly made the inculpatory statements to Shannon, Shannon also was not incarcerated at the time he testified about those statements. I therefore disagree with the majority's categorization of Shannon as "an incarcerated witness who testified about inculpatory statements that the defendant made outside of prison . . . ." See *State* v. *Diaz*, supra, 302 Conn. 110 ("when a witness is not incarcerated, but is merely on parole or subject to pending charges, the special concerns relating to incarcerated witnesses do not come into play"); *State* v. *Carattini*, supra, 142 Conn. App. 523 (distinguishing witness from jailhouse informant definition in *Diaz* because witness was not incarcerated when he testified). After Shannon reached out to the police in 2013, he testified that the state assisted him by getting his bond lowered. He then pleaded guilty to two felonies in 2014 and did not have to return to jail. Instead, Shannon was on probation when he testified for the state. Although Shannon cooperated with the police while he was incarcerated, this does not transform him into an incarcerated informant at the time of his testimony. This distinction is important because Shannon's testimony is even more credible than the testimony at issue in *Diaz*, in which the witnesses "had criminal matters pending"; *State* v. *Diaz*, supra, 302 Conn. 95; as Shannon had *already* received assistance with his case before testifying and, therefore, had less incentive to testify falsely in order to secure a future benefit from the state. Accordingly, the majority's reliance on the motivations of the "incarcerated informant" are largely inapplicable to Shannon with respect to the motivation to lie in exchange for a *future* benefit that characterizes typical jailhouse informant testimony.[3]

Finally, I note my disagreement with the majority's reliance on the definition provided by the legislature in No. 19-131 of the 2019 Public Acts (P.A. 19-131), which sought to address the "problems inherent in the state's use of jailhouse informant testimony" by enhancing the state's disclosure obligations and providing for an evidentiary hearing to establish the reliability of proffered jailhouse informant testimony in the most serious felony cases. *State* v. *Leniart*, supra, 333 Conn. 164–66 (*Palmer, J.*, concurring in part and dissenting in part). In my view, the majority's reliance on P.A. 19-131, as amended by No. 19-132 of the 2019 Public Acts (P.A.

19-132), is misplaced. The statutory definition provides: " '[J]ailhouse witness' *means a person who offers or provides testimony concerning statements made to such person by another person with whom he or she was incarcerated*, or an incarcerated person who offers or provides testimony concerning statements made to such person by another person who is suspected of or charged with committing a criminal offense." (Emphasis added.) P.A. 19-132, § 6, codified at General Statutes (Supp. 2020) § 54-86o (d).

Although the first of these definitions in P.A. 19-132 is entirely consistent with our definition in *Diaz*, the second definition is broader, as it does not specifically require the offered statement to be made while both individuals are incarcerated and, therefore, is inconsistent with our existing definition of a jailhouse informant. Yet, this is not an irreconcilable conflict, as one of the included definitions is found in our case law. Also, P.A. 19-131 does not discuss jury instructions and, instead, requires trial courts to conduct hearings to determine the reliability and admissibility of jailhouse informant testimony. See P.A. 19-131, § 2, codified as amended at General Statutes (Supp. 2020) § 54-86p. Although Shannon may fall under the second definition provided by the legislature, I do not believe that we should assume that the legislature is invalidating our case law's definition as to jury instructions. See, e.g., *State* v. *Fernando A.*, 294 Conn. 1, 19, 981 A.2d 427 (2009) ("the legislature is presumed . . . to be cognizant of judicial decisions relevant to the subject matter of a statute . . . and to know the state of existing relevant law when it enacts a statute" (internal quotation marks omitted)). Indeed, I am particularly hesitant to act in this area, given this very recent activity by our legislature, which has the " 'primary responsibility' " for the public policy of this state; *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 438, 119 A.3d 462 (2015); and is better equipped to "balanc[e] the various interests and articulat[e] a coherent policy on this matter . . . ." *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 550, 93 A.3d 1142 (2014). Because the legislature was presumed to be aware of our case law's instructional requirements and left them untouched in P.A. 19-131, it is unnecessary to harmonize all of our definitions. In fact, now that the legislature has provided a screening mechanism for jailhouse informant testimony, and only the most reliable evidence will be put before the jury, P.A. 19-131 weighs against the requirement of a special credibility instruction in every instance.

In the present case, I conclude that the trial court appropriately exercised its discretion when it declined to issue a special credibility instruction as to Shannon's testimony.[4] See *State* v. *Diaz*, supra, 302 Conn. 113 (emphasizing "the well established common-law rule that it is within the discretion of a trial court to give a

cautionary instruction to the jury whenever the court reasonably believes that a witness' testimony may be particularly unreliable because the witness has a special interest in testifying for the state and the witness' motivations may not be adequately exposed through cross-examination or argument by counsel"). The jury was well aware of Shannon's motives for testifying, as both the state's attorney and defense counsel had questioned Shannon about the benefits he received for reaching out to the police and his past felony convictions.[5] Defense counsel also devoted significant portions of his closing argument to Shannon's credibility. As Shannon did not qualify as a jailhouse informant and the jury was well aware of his motivations for testifying, I cannot conclude that the trial court abused its discretion by issuing only a general credibility instruction. Accordingly, I would conclude that the Appellate Court properly upheld the defendant's conviction.

Because I would affirm the judgment of the Appellate Court, I respectfully dissent.

[1] "This court has held . . . that a special credibility instruction is required for three types of witnesses, namely, complaining witnesses, accomplices and jailhouse informants." (Footnotes omitted.) *State* v. *Diaz*, supra, 302 Conn. 101–102.

[2] Other states limit the definition of a jailhouse informant in a similar manner, whether by statute or case law. See Cal. Penal Code § 1127a (a) (Deering 2008) (defining "in-custody informant" as "a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution"); *Wright* v. *State*, 30 P.3d 1148, 1152 (Okla. Crim. App. 2001) (concluding that defendant's "statements to [the witness] were not made while he was incarcerated" and, thus, did not qualify witness as jailhouse informant, even though witness was "in jail on unrelated charges at the time he gave his statement to [the] police" (internal quotation marks omitted)); *Hardesty* v. *State*, Docket No. 03-18-00546-CR, 2019 WL 4068564, *3 (Tex. App. August 29, 2019, pet. ref'd) (concluding that witness, who testified to defendant's confession, was not jailhouse informant because they were not incarcerated together as required under Texas statute); see also R. Bloom, "Jailhouse Informants," 18 Crim. Just. 20, 20 (Spring, 2003) ("[u]nlike 'street' informants, jailhouse informants are witnesses who testify as to statements made by a fellow inmate while both are in custody"); J. Roth, "Informant Witnesses and the Risk of Wrongful Convictions," 53 Am. Crim. L. Rev. 737, 748 (2016) ("[T]he typical jailhouse informant claims to have overheard a defendant's inculpatory statement while both are in custody pending trial; it is this statement that is of value to prosecutors and agents. But the jailhouse informant usually does not assert any personal, or prior, knowledge of the offense the defendant is charged with having committed. *By contrast, nonjailhouse informants—even those who already are in custody when they begin to work with law enforcement—typically offer information about crimes they observed, participated in, or otherwise learned about prior to their custody*." (Emphasis added.)).

[3] I acknowledge that an informant who is not incarcerated at the time of testimony, but has pending criminal matters or is otherwise facing incarceration, may have a greater incentive to testify falsely than an informant like Shannon, who has no pending criminal matters. For this reason, an individual's custodial status at the time they testify or provide the information to the police should not determine whether they are considered a jailhouse informant. If the custodial status of the witness at those times were the sole determinative factor, then the jury instruction would not be given when an actual jailhouse informant—testifying about communications made while incarcerated—happens to be released prior to testifying or cooperating. Put differently, the determination of who qualifies to be a jailhouse informant depends on the timing and circumstances of how that individual obtained the information and, specifically, on whether the defendant made the state-

ments at issue to the informant while *both* were incarcerated.

[4] In the present case, twenty to thirty people were present when the officers arrived at the scene of the crime, yet none of these potential witnesses was willing to cooperate with the police. Both Shannon and Angela Teele, another cooperating witness, testified that, in their experience, they are not supposed to cooperate with the police. In fact, Teele testified that she feared for her safety and was putting herself at risk by testifying because "I was told if I said something that things was gonna happen." Shannon also testified that he feared cooperating due to possible retaliation. Incentives from the state encourage witnesses to testify, despite the dangers of providing such testimony. Prosecutors may be required to utilize witnesses, such as Shannon, who are testifying only because they have been assisted by the state, and requiring a special credibility instruction in all such instances may cast significant doubt on an otherwise reliable witness. See *State* v. *Diaz*, supra, 302 Conn. 111 ("the government must often rely on witnesses with a less than impeccable history in order to prosecute criminal activity" (internal quotation marks omitted)). Additionally, as such witnesses are used with some regularity; see G. Harris, "Testimony for Sale: The Law and Ethics of Snitches and Experts," 28 Pepp. L. Rev. 1, 1 (2000) ("[a]ccording to [United States] Sentencing Commission studies, one of every five federal defendants receives a sentencing reduction for 'substantial assistance' to the government"); the special credibility instruction will become less powerful as it will be used more frequently.

[5] Defense counsel rigorously cross-examined Shannon regarding the circumstances that led him to reach out to the police:

"[Defense Counsel]: And now you indicated earlier, you . . . didn't contact the police on the night of [the] shooting, right?

"[Shannon]: Yes.

"[Defense Counsel]: Okay. And, in fact, you didn't contact the police until about two and [one-half] years later, right?

"[Shannon]: Yes.

"[Defense Counsel]: Okay. And, at that time, you were in jail, right?

"[Shannon]: Yes.

"[Defense Counsel]: You were being held at Bridgeport Correctional Center?

"[Shannon]: Yes.

"[Defense Counsel]: Okay. Jail is not a place that you like to be, right?

"[Shannon]: Yes.

"[Defense Counsel]: And you wanted to get out of jail, right?

"[Shannon]: Yes.

"[Defense Counsel]: Okay. And so it's at that point that you reached out to detectives and said that you have some information about this homicide that occurred on June 21, 2010, right?

"[Shannon]: Yes.

"[Defense Counsel]: And you reached out to them because you were hoping that they could give you some favorable treatment on your jail situation or your . . . criminal charge, right?

"[Shannon]: Yes.

"[Defense Counsel]: In fact, at the time you were . . . charged with a felony, right?

"[Shannon]: Yes.

"[Defense Counsel]: And it carried a maximum penalty of five years in jail, right?

"[Shannon]: Yes."

\* \* \*

"[Defense Counsel]: And, shortly after that, you were released from jail without having to pay a bond, right?

"[Shannon]: Yes.

"[Defense Counsel]: And a bond is money that you have to pay to get out of jail, if you're facing pending charges?

"[Shannon]: Yes.

"[Defense Counsel]: You didn't have the money . . . to get out of jail, right?

"[Shannon]: No.

"[Defense Counsel]: Okay. So you were hoping to trade the information that you ha[d] in order . . . to accomplish that, right?

"[Shannon]: Yes.

"[Defense Counsel]: And, in fact, you were also looking for some favorable treatment on your case, right?

"[Shannon]: Yes."